162484, David Littlefield et al. v. Mashpee Wampanoag Indian Tribe. Counsel. Thank you, and may it please the Court. Judge Lynch, may I reserve three minutes for rebuttal, please? Yes, you may have it. Thank you. The Mashpee, under the Indian New Deal, through which Congress sought to effect a wholesale reversal of centuries of mistreatment of Indians, Counsel, we know all of this. You have limited time. There are some very difficult legal issues here. Can we start with the question of whether there is ambiguity as to the such phrase? And as you answer that question, please answer the question of whether we can look to canons of construction in answering that question or whether we resolve the ambiguity merely from the plain text of the statute. Okay? Thank you. So let's go. Happily. The standard for determining whether the critical phrase, such members, is ambiguous here is whether that phrase, as this Court put it in Ogaragua y Vidal Penalti Cierto, whether it is at least plausible that there are two constructions of that language. The question is not what is the natural meaning, as appellees would have it, or what's the right construction or the wrong construction, but whether the construction that the appellant Mashpee Wampanoag proposes is at least plausible. In the Carcieri case, where I was reversed by the Supreme Court ruling in favor of the tribes, I thought it was at least plausible that the word now had the interpretation that the BIA put on it. And the Supreme Court did not seem to use a least plausible standard to determine what the plain text meant. Your Honor, the Court did apply a standard of ambiguity that is exactly on all fours with this Court's standard for at least plausible. And although the Court in Carcieri ultimately reversed this Court's decision on a term that is not at all an issue here, the word now in the first definition of Indian, that decision is nevertheless instructive in terms of how one goes about in determining whether a phrase, like such members here, is in fact ambiguous. And in going through the Supreme Court in Carcieri, looked at some of the same critical elements upon which appellees seek, but fail to successfully rely here. First, in Carcieri, the Supreme Court looked at dictionary definitions of the term now, where the question was whether the phrase now in the first definition referred just to the point in time when the Indian New Deal or the Indian Reorganization Act was enacted, or to some point thereafter when land was taken into trust. The dictionary definitions there were exactly on point. They said at the present time, among other things that were clear, that it meant when the statute was enacted. The Supreme Court there also looked at case law, as appellees seek to do here. And there, the case law was clear and consistent, a line of cases that were interpreting the word now in the context of when a statute is to have effect. It's as of the point at time in which Congress actually enacted that statute. Third, the Supreme Court looked at the natural meaning. But unlike appellees, they did not simply recite the mantra natural meaning, natural meaning. The Supreme Court looked to the other language in the statute and compared whereas in section 5129, now was on its own. In other sections of the statute where there was an intention of Congress to refer to time going forward, it looked at now or hereafter. In contrast, on each of those three points here, appellees fail to show that there is any ambiguity whatsoever on the point of dictionary definitions. There is no dictionary definition they have said to or upon which the district court relied that says that such necessarily refers back to the entirety of an antecedent clause. Nothing on point. In fact, the Ninth Circuit in Christchurch looked at dictionary definitions and came to the exact opposite conclusion of the district court here. Counsel, are you saying that such is inherently ambiguous? Are you saying that? No, Your Honor. Such oftentimes is crystal clear. For example, in the Decatur case upon which appellees rely, if in the antecedent. Okay, so what would, in the way in which this statute is structured, the way in which the word such is used, what would suggest to you that in looking at the antecedent phrase, you can simply drop off the words now under federal jurisdiction in 1934? What signals to you that you can do that? So, Your Honor, I think there are two buckets of answers to that. First is, of course, looking at the language of the statute itself. And the second is looking at how that statute was actually applied contemporaneously with its enactment, including as to the Catawba Indian tribe. As to the first, when you look at the structure of the statute itself, in light of the purpose to see. But what you seem so eager to do is jump to purpose. It's a remedial statute. It should be interpreted in favor of the tribes. You are eager to get there, arguably, in order to introduce an ambiguity. You should get there only after you've been able to establish that there's an ambiguity. Your Honor, I agree with you entirely. I'm not suggesting that the canons of construction be applied before the court answers the initial question of ambiguity. What I am saying, though, is that in looking at the statute, as reading any statute on its face, courts take into consideration the background in light of the intent of the statute. Looking at the statute on its face, Section 5129 sets out three categories of Indian for folks defined as Indian to receive benefits under the Indian New Deal, including to have land taken into trust. The first, regarding those under federal jurisdiction. The second, as to reservations. And the third, based on blood. Now, this sets out three channels for Indians, potentially, to obtain rights under the IRA. For such to necessarily refer back to the entirety of the antecedent clause, which is then, frankly, invented grammatical rule to which appellees have failed to cite anything anywhere, would render the second definition, based on reservations, a mere plausibility, as the district court decision said, a hypothetical, pure surplusage. Because, as the district court concluded, if the second definition, such members, is interpreted to refer back to the entirety of the first definition, then it is, quote, plausible, not a factual finding on the record, because there was nothing in the record on this point, but plausible that certain unenrolled Indians residing on reservations might fall within the second definition. So you say it's just sort of a hypothetical, it's kind of a meaningless category. In Carcieri, in trying to understand what now might mean, the court did look at some so-called Collier Memorandum. They did look at that. That same memorandum speaks to the meaning of the second definition as well and suggests that it does have a distinct purpose. Yes, it might incorporate a relatively small group of individuals, those not enrolled in the tribe, at the relevant date. But, I mean, we have evidence that this is not hypothetical, that it was designed to capture a particular group. What do you do with that? I agree with you entirely, Your Honor, that the second definition is not hypothetical. It is meant to capture a particular group, and those are Indians that were residing on a reservation at the time, descendants, excuse me, of members of a recognized Indian tribe, residing on an Indian reservation. If you acknowledge that, then how can you say that, in effect, it would be absurd to incorporate the entire antecedent phrase? Because that phrase includes under federal jurisdiction. Your Honor, you just referred to the Collier Circular as a contemporaneous touchpoint for how it was understood. I'd like to direct the Court's attention to another contemporaneous touchpoint, which is how the Department of the Interior treated the Catawba Indian tribe. This is discussed at footnote 12 in our reply brief. The Catawba Indian tribe was not under federal jurisdiction. In fact, according to the legislative history to which we've cited, the federal government was not aware they existed. But they were living on a reservation in South Carolina at exactly the time of the enactment of the Indian New Deal. About 10 years later, in 1944, the Department of the Interior gave the Catawba Indians benefits under the Indian Reorganization Act while recognizing they were not under federal jurisdiction because they were a recognized Indian tribe that was on reservation land. In other words, the Mashpee Wampanoag fit exactly those characteristics. There's been no determination whether they were under federal jurisdiction, and that's being litigated in the D.C. litigation. But they, as the Department of the Interior found, were on a reservation on June 1, 1934, and they are a recognized Indian tribe. That's the category for the second definition. Going back to the case law discussion I was getting to in answering Judge Lynch's original question, and so the Supreme Court and Cartier had a line of cases that were exactly in line with their dictionary definitions. Here, in stark contrast, the case law goes in exactly opposite direction. In fact, in the only case in this circuit in which this court has had occasion to consider whether such necessarily refers back to the entirety of an unbroken antecedent clause, including, as appellees say, without commas or other punctuation, it reversed the district court decision, the district court there held in Ogaragua y Vida en el Desierto, that such, in the context of the Fair Housing Act, necessarily referred to the entirety of the antecedent clause, unbroken by commas and the like, any single family house sold or vented by an owner. This court concluded in assessing whether the Fair Housing Act's anti-discrimination provisions would apply to a single family owner, looked at the proviso that provides that an individual owner is not subject to those anti-discrimination provisions unless, among other things, he or she does not own more than three such single family houses. So the question was whether the phrase such single family houses necessarily refers to the entirety of that unbroken antecedent clause, quote, any single family house sold or vented by an owner. This court held that the term such single houses did not, may I finish this answer? Yes, and then I've got a question for you. That such single family houses did not refer to that entire antecedent clause because such was a, quote, indeterminate modifier that had latent ambiguity and referred and was therefore ambiguous. After determining it was ambiguous because it was at least plausible, those two alternative constructions, this court applied, after making that initial determination of ambiguity, the principle of remedial statutes, that a remedial statute where ambiguity exists should be interpreted in order to advance that remediative purpose. There, the anti-discrimination provisions of the Fair Housing Act, here, returning lands to immediate owners. I would appreciate it if both sides within 10 days submitted 28 J letters with any other case law about the term such and latent ambiguity in the term. Now, I have a separate question that goes to the BIA's reasoning in their record of decision. They point out that the term Indian is actually used for different purposes other than the purpose involved here of taking lands into trust. Apparently it had to do with elections as to whether tribes were going to take the benefit of the IRA and registration of people and I think there was something else. Could you tie, but I didn't see what the connection was of those different uses to the second, how one defines the second clause. And so I'm asking you to help clarify on that point. Your Honor, as the court's aware, that's not an issue that has been briefed between the parties. That's not something that was argued below and I think that those alternate definitions reflect on the highest level only that the broad intent of the statute to seek as many channels and routes as possible to provide benefits for Indians under the Act. Certainly the second definition in particular was one of those, and this court's decision in the underlying Cartier opinion, a point on which the Supreme Court did not remark a reverse. In Judge Lynch's decision, this court recognized that the second definition refers to the status quo reservation Indians as a separate category of Indians. And so, although I don't have at my fingertips at the moment all the other potential definitions of Indian, certainly that's one distinct category that this court's recognized and that the Supreme Court has not reversed on. And the myriad other definitions are reflective of the broad intent to really entirely reverse the Indian tribe's treatment by the United States. Okay. Thank you. Thank you. Good morning, Your Honors. David Tennant on behalf of the Appellees. With respect to comments about the broad application of the Indian Reorganization Act, you have to look at actually what was happening in 1934 and what Congress was intending. And clearly, if you look at the legislative history, if you go there, you see, in fact, Indian Commissioner John Collier, a very strong tribal advocate, described as the principal drafter of the IRA, coming to Congress with a very ambitious program. You see the Senate, in keeping with the realistic times and limited resources. So, Counsel, here's where it gets confusing and circular. I mean, I would think your position would be that there's no ambiguity here, that invoking some of the rules that you invoke, some of the precedents that such absence of other kind of signals embraces the entirety of the antecedent clause. Instead of going there, right away, you're talking about legislative history, administrative memoranda and so forth, in order to convince us that such means a certain thing. That sounds like an argument premised on ambiguity, and you're trying to suggest, in light of all that history, we should resolve the ambiguity in a certain way. Tell me what you want us to think about your argument. No, Your Honor. And I was responding to Counsel's broad overstatements of what the IRA was about. But obviously, from our perspective, it is about the plain text. And I think you can't look at a matter of grammar, syntax, basic rules of looking at how parts of a paragraph work together, relationships between sentences. There's no other way to read such members other than to go back. Except the BIA quite disagreed with you, and they said, we think there are different ways of reading this. And it's not so obvious that either one of you is correct, that there is just a plain meaning here. With respect, Your Honor, the Secretary of Interior and Counsel for the government below, and Counsel for the tribe here, they've never identified any of the, what the Supreme Court calls interpretive clues, something in the text that would actually interrupt what is otherwise the natural reading. And there is a natural reading, and you can find it actually stated in Justice Stevens' dissent in Cartier. And, you know, his language is directly just kind of continuing the idea of there being every descendant, it's going to be part of and subject to the category of members of recognized tribes under federal jurisdiction. He puts them together. The Supreme Court in the United States v. John, just in reciting the statute, puts them together. And this court in 2005 in Cartier, adopting the language of United States v. John, naturally puts them together. There isn't a way to split them apart other than to say, well, we think we should redraw the lines that Congress actually drew. We think that there's something here that should be done differently, even though the text of the statute doesn't give you a clue. There's nothing in the language, as Your Honor was saying, there's nothing in the text, and this is totally unlike Hogar and totally unlike Christick, where the statutes were confounding. The courts even said a masterpiece of obfuscation in Christick, in this court, in Hogar, was calling the use of the language and the term such curious and using such ten times and having to get to the point where, in that case, you're looking at all kinds of inconsistencies in the fact that the second proviso would be entirely wiped out under the Fair Housing Act if you gave the reading of just the plain text. There's got to be some tension within the structure of the statute that would interrupt giving the plain text its normal meaning, its plain reading, and there isn't anything here. What happens, counsel, when you do incorporate the entire antecedent phrase, you end up in definition two with two references to June 1, 1934. I mean, on its face, that's a bit of a head-scratcher, and then the only way that you seem to be able to make sense of it is what Judge Young does. He said, well, this is not hypothetical. You could be talking about individuals who are living on the reservation. They are descendants of individuals who were members of a recognized tribe, but they themselves are not members of a recognized tribe. And then it turns out, in 1936, there seems to have been some contemplation of a group just like that, but it's only by going to that external source that you say, well, maybe this does make some sense. So it's, again, we seem to only be able to answer feelings of uncertainty about what this might mean by going to an external source. Doesn't that suggest there's an ambiguity? No, Your Honor. I think if you just look at the plain text, as written as Judge Young did, that you do not have to resort to anything else to find that the language does make sense. There isn't any inconsistency. No, that can't possibly be the standard. Just as I took your brother to task on plausible readings, it's a little difficult to say this is a necessary reading, that it's impossible to have any other reading. And I believe that that's the test you just articulated, and that's not the law either. My understanding of the law, Your Honor, is that there has to be an interpretive clue, something actually in the text, something in the structure of the statute itself, that would allow a reading that locks off half of an antecedent phrase. Such members naturally, if you gave it to a hundred English teachers, they would all say it includes the full antecedent. There isn't anything there that gives you any signal, any clue, that you should depart from what would otherwise be the full incorporation. The clue can be the incoherence that results from the incorporation of the entire antecedent phrase. Again, you just sort of read that and say, that sounds pretty weird. Your Honor, if I could address that. Sure. What Congress was trying to do in 1934 was to come up with three different categories of Indians who could benefit from the IRA, and Congress was limiting, narrowing what Collier wanted to do. They actually, as the legislative history shows, they inserted the under federal jurisdiction requirement for the first definition. They also increased the blood quantum requirement for the third definition from 25% or more to 50% or more. So Congress was trying to narrow the field. What they were trying to do with the second category is to have, and again, the plain reading of that is the descendants of such members then residing, as of June 1, 1934, on a reservation. All it's saying is that those descendants have to be descended from members of recognized tribes that were under federal jurisdiction in 1934. There is actually no inconsistency at all. The second definition is in parallel and working with and providing this reservation residency requirement that is different from the first definition, and it is just like the Supreme Court in Carcheri with Justice Thomas in his majority opinion and Justice Breyer in his concurring opinion, specifically looking at the Collier memo, the very same memo, and finding in that the contemporary expression of the Department of Interior that now meant 1934. That same circular was not treated as opening the door to all the legislative history. Justice Thomas in his majority opinion looked at it and said, this is an unusually reliable source, but we don't have to defer. And Justice Breyer used it in his analysis as he did consider legislative history to resolve the question of whether now was ambiguous or not. And I would say now is a whole lot more ambiguous than such. Now actually has, you know, now and hereafter, there are all kinds of ways that you might argue that now has ambiguity. So if you had been on the Supreme Court, maybe we would have been affirmed. But the question here is such, and such is just a word of grammar. I'm confused as to whether you are actually relying on the Carcheri memo or whether you are arguing that it's impermissible under Justice Thomas' view for us to even look at it. I think in keeping with Your Honor's view of legislative history and this court and comparing it to what the Supreme Court does, you can look to legislative history, these contemporaneous pronouncements, but to check on the reading that is naturally coming from the text. That kind of check is in the language of this court and is also in the language of Justice Thomas. So it's a limited consideration of a single circular to get you to the point of understanding, oh yeah, this second category makes perfect sense to the drafter and the implementer as the Indian Commissioner. He's saying in that circular two years after the IRA, we're going to need to record these people. There will be people, Indians, coming in under Definition 1 and under Definition 3. But you know what? There aren't going to be many people in Definition 2. In fact, on our form that we're going to give you out in the field, you don't even have an entry for Definition 2 Indians. There are going to be just a handful unenrolled. And whether they're minors or Indians coming from other reservations to join a group that they're not a member of, or they're having members marry out and otherwise there's matrilineal descent and blood quantum requirements, all kinds of ways in which you'd have a category, a group, residing on reservations who are really tribal Indians that the IRA Congress wanted to sweep up but wouldn't have any way to do it because they're not enrolled members of the tribe. So that is the purpose of that second category. It works completely in sync with the first. And the third category is a standalone that doesn't require any kind of tribal affiliation. And this is coming back to just reading the text as written without having to go beyond. But if you do go beyond, like the Supreme Court did in Carcheri, you can look to the Collier Memo to confirm what is otherwise the only grammatical reading. I'd like to get your response to the same question I asked your opponent, which is the BIA talks about the fact that this definition is used for a number of different purposes, not just taking lands into trust. And from that, the BIA made a sort of general argument that that means that the clause must be understood as having some inherent flexibility. And from that flexibility, really some deference should be given to the Bureau's view of things, that that's what Congress intended. Whether that squares with Carcheri is a different matter. But I'm just trying to understand more clearly what the linkage was that the BIA saw between those other categories and this definition. If I'm understanding the issue correctly, there are other benefits besides being eligible for land being taken into trust. If you qualify under who is an Indian for purposes of the IRA, and that would include other things. And certainly the Indians who were brought within the IRA would typically have their members enrolled with the Office of Indian Affairs. They would get services through that and would otherwise benefit. So that's the way in which the IRA was to use these definitions to basically serve the populations defined by the three definitions, which the Supreme Court at Carcheri said are detailed and unyielding. And Justice Breyer said... Okay, so I take it your position is the fact that they're used for different purposes actually doesn't shed any light on what the second definition means. Correct. And it doesn't alter the plain text. Correct. So you disagree with the BIA as to that? Yes, Your Honor. Okay. I say I'm over my time unless there are other questions. No, thank you. Thank you. In looking back at Carcheri and taking the Court's questions about exactly what the standard for ambiguity is here, the Court's right, of course, in Carcheri, the Supreme Court didn't say at least plausible. It also didn't say reasonable or any other term of art. Instead what it did, and I think this is the appropriate analysis for this Court to follow here, is to consider whether by looking at dictionary definitions, the case law, and the natural meaning, by looking at the structure of the statute, the meaning was clear. Here it is not. And I think that that is the appropriate rubric for this Court to consider under. I won't repeat what I said before about the analysis under Carcheri. Here what my brother argues is that simply the natural meaning is that you have to look back to the entire antecedent clause, but he has no citation for that rule anywhere, not in a dictionary, not in a book of grammar, not in the case. Absolutely. Do you disagree with the proposition that the, I guess you do, but I guess I'd like you to elaborate on it, that the most absent some other clue, some signal, that the most natural meaning, excuse me, is not, and the word such is in that second definition, that it does not incorporate the entire antecedent. Why isn't that the most natural meaning? That's what I am struggling to understand. Your Honor, it is not the most natural meaning. It is not necessarily the most natural meaning. The consistent theme of dictionary definitions and the case law between the parties you have canvassed is that such typically does refer back to something, but that it does not have to refer back to everything, and the Kristich case is on exactly that point, the Katik case upon which appellees rely. Okay, so refers back to something. What permits you to say that that something includes everything in the antecedent phrase except now under federal jurisdiction? What permits you to draw the line there? Your Honor, we are not drawing any lines. We are not arguing that that is the right answer, because the first question is not whether the reading is right or one reading is more natural or another is less natural. The question is whether more than one reading is permissible, and because it's not crystal clear that such necessarily refers back to the entirety of the antecedent clause, including because of the incoherence that results that you noted in questioning my brother, we result in ambiguity, and when we have ambiguity, we then have three principles of statutory construction that are not disputed that require this court to interpret such language in favor of the Mashpee Wampanoag tribe under the principle of a remedial statute for that purpose to be interpreted to advance the remedial nature here to return land to tribes who have stolen from them. Second, the Indian canon of construction in which any ambiguity is to be resolved in favor of tribes, including because of the government's fiduciary relationship to tribes. And third, ordinary Chevron deference. What do you say about your brother's point that the drafting history of the statute indicates an effort to narrow rather than to expand, and that that should take precedence over sort of general statutory interpretive presumptions in favor of Indian tribes? Your Honor, the first point that I would make is that by his reliance on that legislative history, his reliance on that is reflective of the fact that he needs to resort to that in the first instance because he has no support for the grammatical argument he seeks to make. He cannot get to his so-called plain meaning without resorting to exactly the tools used to interpret an ambiguity, which is what we have. Well, I don't think his point was that he had to look to the drafting history in order to sort of resolve an ambiguity, but that the drafting history indicated that what he and the district court thought was a fairly clear meaning was in fact entirely consistent with what they were trying to do. So, Your Honor, there is absolutely nothing in the legislative history on the specific point of what the second definition means in the such-members phrase. No, but what do you say about the drafting history, which shows an inclination to narrow rather than expand the statute?  Your Honor, in the legislative history, when the statute was introduced for enactment by Congress, this is at 78, Congressional Record 11727, the representative introducing the bill explained that, quote, this is to strike a body blow at the twin evils of economic and social disintegration of the Indians, including through the, quote, sinister liquidation of Indian property, which is exactly what we're talking about here. This was not a statute meant to nibble around the edges, but rather to hit a body blow against the centuries of mistreatment of Indian tribes by the United States. It was ambitious. It was far-reaching. For that reason, among other things, a cornerstone purpose of the IRA, and this, again, is from the legislative history, was to, quote, provide for the acquisition through purchase of land for Indians, now landless, who are anxious and fitted to make a living on such land. I thought your better argument was the deliberate use of the word and, that that shows not an intent to narrow, but an intent to expand. That's exactly right, Your Honor. And I didn't want to repeat myself, but in opening, of course, the structure of the statute reflects that there are three distinct channels that Congress established through which Indians could obtain benefits under the Indian Reorganization Act, using the language and. The first relating to under federal jurisdiction, the second to reservations, which this court has recognized as a status quo category of Indian, and the third related to blood. Any other questions? Well, you've managed to convince us we have no more questions, but a lot of work to do. Thank you very much. Thank you all.